Benjamin A. Schwartzman
Wade L. Woodard, NMSB No. 9519
GREENER BANDUCCI SHOEMAKER P. A.
950 W. Bannock Street; Suite 900
Boise, ID  83702
Telephone:  (208) 319-2600
Facsimile:  (208) 319-2601

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| QUINN WOODARD, on behalf of himself and a Class of all others similarly situated,<br><br>                Plaintiff,<br><br>v.<br><br>FIDELITY NATIONAL TITLE INSURNACE COMPANY, a foreign corporation,<br><br>      Defendant. | Case No. CV-06-1170 RB WDS<br><br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO FIDELITY NATIONAL TITLE COMPANY'S MOTION TO DISMISS** |

## PLAINTIFF QUINN WOODARD'S MEMORANDUM OF LAW IN OPPOSITION TO FIDELITY NATIONAL TITLE COMPANY'S MOTION TO DISMISS

**TABLE OF CONTENTS**

I.      INTRODUCTION ...........................................................................................1
II.     BACKGROUND ...........................................................................................2
        A.      The Business of Title Insurance. ....................................................2
        B.      The Statutory Regulation of Title Insurance Premiums. ...............4
        C.      Plaintiff's Complaint and Allegations. ...........................................5

III.    ARGUMENT ................................................................................................5
        D.      Standard Applicable to a Motion to Dismiss. .................................5
        E.      Plaintiff has Standing to Sue Individually and on Behalf of Absent Class Members in New Mexico and in Other States. ...........................................................................6
                1.      Defendant Confuses the Concepts of Article III Standing and Typicality. .........6
                2.      Plaintiff Alleges Injury to Himself and Absent Class Members. .....................7
                3.      Plaintiff Does Not Allege that the Injury to Himself Violated the Laws of Other States. ........................................................................8

        F.      PLAINTIFF'S COMPLAINT STATES A CLAIM UPON WHICH RELIEF CAN BE GRANTED. ..10
                1.      Plaintiff States a Claim for Injunctive and Declaratory Relief. .......................10
                2.      An Implied Right of Action Exists Under the New Mexico Title Insurance Law, *N.M.S.A. § 59A-30-1, et seq.*...............................................................12
                3.      Fidelity Breached Its Implied Contract With Plaintiff to Charge the Legally Mandatory Premium Rate. .....................................13
                        a.      Plaintiff has pled all the elements necessary to establish an implied in fact contract, and its breach by Fidelity. ...........................................14
                        b.      Other courts have found an implied in fact contract to exist in nearly identical circumstances. .................................................15

                4.      Plaintiff States a Claim for Violation of the New Mexico Unfair Practices Act, N.M.S.A. § 57-12-1, *et seq.* ...........................................................16
                        a.      Plaintiff Woodard establishes all elements of his claim. ...................16
                        b.      The heightened pleading standards of F.R.C.P. 9(b) do not apply to Plaintiff Woodard's claim under the UPA. ........................................18
                        c.      Under any pleading standard, Plaintiff Woodard has alleged his UPA claim with sufficient particularity. .....................................................19

                5.      Plaintiff States a Cause of Action for Conversion...........................................20
                6.      Plaintiff States a Claim for Unjust Enrichment..............................................21
                7.      Plaintiff States a Claim for Breach of the Duty of Good Faith and Fair Dealing. ........................................................................22
                8.      Plaintiff States a Claim for Money Had and Received..................................24

IV.     CONCLUSION ...........................................................................................24

## Cases

*Accord Barnes*, 2006 WL 2265553 ...............................................................................16

*Accord Easter v. American West Financial*, 381 F.3d 948, 961 (9th Cir. 2004)..................8

*Ashlock v. Sunwest Bank*, 107 N.M. 100, 753 P.2d 346 (1988)........................................17

*Barnes v. First Am. Title Ins. Co.*, 2006 WL 2265553 (N.D. Ohio Aug. 8, 2006).............2

*Bourgeous v. Horizon Healthcare Corp.*, 117 N.M. 434, 438, 872 P.2d 852 (N.M. 1994)......23

*Cf. Sollenbarger v. Mountain States Telephone & Telegraph Company*, 121 F.R.D. 417 (1988) .........9

*Chesner v. Stewart Title Guar. Co.*, 2006 WL 2252542 at *4-*5 (N.D. Ohio Aug. 4, 2006).........2

*Clark v. McDonald's Corp.*, 213 F.R.D. 198, 204-05 (D.N.J. 2003) .............................8

*Cohen v. Chicago Title Ins. Co.*, 2006 WL 1582320, * 3 (E.D. Pa. 2006) ...................2, 22

*Conley v. Gibson*, 355 U.S. 41, 48 (1957)..............................................................5, 6, 10

*Continental Potash, Inc. v. Freeport-McMoran, Inc.*, 115 N.M. 690, 704, 858 P.2d 66, 80 (N.M. 1993)
.................................................................................................................................13

*Cottonwood Enterprises v. McAlpin*, 111 N.M. 793, 796, 810 P.2d 812 (1991)................12

*De La Cruz v. Tormey*, 582 F.2d 45, 48 (9th Cir. 1978)..................................................6

*Dubin v. Sec. Union Title Ins. Co.*, 832 N.E.2d 815 (Ohio Ct. App. 2005) ....................2

*Elgin v. Gross-Kelly & Co.*, 20 N.M. 450, 451, 150 P. 922 (N.M. 1915).........................24

*Garcia v. Middle Rio Grande Conservancy Dist.*, 121 N.M. 728, 732, n.1, 918 P.2d 7 (1996)............14

*Gonzales v. Surgidev Corp.*, 120 N.M. 133, 140, 899 P.2d 576, 583 (1995)....................18

*Hartbarger v. Frank Paxton Co.*, 115 N.M. 665, 669, 857 P.2d 776 (1993)....................14

*Henderson v. Lawyers Title Ins. Corp.*, 108 Ohio St.3d 265, 272, 843 N.E.2d 152 (2006)................3

*Honig v. Doe*, 484 U.S. 305, 318, 108 S. Ct. 592 (1988) .............................................11

*Hydro Conduit Corp. v. Kemble*, 110 N.M. 173, 175, 793 P.2d 855 (1990) .....................21

*Id.* ............................................................................................................................23

*In re Buspirone Patent Litig.*, 185 F.Supp.2d 363, 377 (S.D.N.Y. 2002) ........................8

In re Coordinated Title Ins. Cases, 2004 WL 690380 (N.Y. Sup. Ct. Jan. 8, 2004) ......................2

*In re Pharmaceutical Industry Average Wholesale Price Litig.*, 263 F.Supp.2d 172, 193-94
(D.Mass. 2003) .....................................................................................................8

*In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 269 (D. Mass. 2004)...............................8

*In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp.2d 1365, 1371 (S.D. Fla. 2001) ..............7

*Inland Title Co. v. Comstock*, 116 Idaho 701, 703, 779 P.2d 15 (1989)...........................4, 14, 15, 16

*James v. City of Dallas*, 254 F.3d 551, 562 & n. 9 (5th Cir. 2001)...................................8

*Koch v. Koch Industries, Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000) ............................20

*Lewis v. Casey*, 518 U.S. 343 (1996)...................................................................7, 8

*Lisanti v. Alamo Title Ins. of Texas*, 131 N.M. 334, 337, 35 P.3d 989 (N.M. App. 2001)..................12

*McNeill v. Rice Engineering & Operating, Inc.*, 139 N.M. 48, 58, 128 P.3d 476 (N.M. App. 2005)...20,
21

*Mitchell v. Chicago Title Ins. Co.*, 2003 WL 23786983 ................................................2

*Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551 (D. Md. 2006) .............................2

*Murphy v. Hunt*, 455 U.S. 478, 482, 102 S. Ct. 1181 (1982)..........................................11

*Ontiveros Insulation Co., Inc. v. Sanchez*, 129 N.M. 200, 203, 3 P.3d 695 (N.M.App. 2000)..............21

Oregon Revised Statutes Section 646.605........................................................................17

*Ostrzenski v. Siegel*, 177 F.3d 245, 251 (4th Cir. 1999) ...............................................19

*Payton v. County of Kane*, 308 F.3d 673, 680, 682 (7th Cir. 2002)................................8

*Porter v. Jones*, 1319 F.3d 483, 489-90 (9th 2003) .......................................................11

*Qarbon.com Inc. v. eHelp Corp.*, 315 F. Supp. 2d 1046 (N.D. Cal. 2004)......................19

*Randleman v. Fidelity Nat. Title Ins. Co.*, 465 F. Supp.2d 812 (N.D. Ohio 2006) ........................2
*Recreation Services, Inc. v. Odyssey Fun World, Inc.*, 952 F.Supp. 594 (N.D.Ill. 1997).....................19
*Ruiz v. Garcia*, 115 N.M. 269, 850 P.2d 972 (1993)..................................................................12, 13
*Russey v. Rankin*, 911 F.Supp. 1449, 1460 (D.N.M. 1995) ..............................................19
*Scott v. First American Title Ins. Co.*, 2007 WL 135909 (D.N.H. Jan. 17, 2007)................................16
*Security Pacific Financial Services, a Div. of Bank of America, FSB v. Signfilled Corp.*, 125 N.M. 38, 43, 956 P.2d 837 (N.M. App. 1998) ...............................................................................20
*Slapikas v. First American Title Insurance Co.*, No. 2:06-cv-00084-JFC (W.D. Pa.) ...................2
*Stern v. Dunlap Co.*, 228 F.2d 939, 942 ...........................................................................13
*Stevenson v. Louis Dreyfus Corp.*, 112 N.M. 97, 100, 811 P.2d 1308, 1311 (1991) .............................19
*Stidham v. Peace Officer Standards and Training*, 265 F.3d 1144, 1149 (10th Cir. 2001).....................5
*Village of Arlington Heights v. Metropolitan Housing*, 429 U.S. 252, 97 S.Ct. 555, 262 (1977)...........9
*Warth v. Seldin*, 422 U.S. 490, 501 (1975).............................................................................8, 9
*Watson Truck & Supply Co. v. Males*, 111 N.M. 57, 60, 801 P.2d 639 (1990) ...................................23

**Statutes**
Arizona Revised Statutes Section 20-376 ...............................................................................5
Arizona Revised Statutes Section 20-379 ...............................................................................5
Arizona Revised Statutes Section 44-1521 .............................................................................17
New Mexico Statute Annotated Section 57-12-3 ..............................................................17
New Mexico Statutes Annotated Section 57-12-1 ......................................................16, 17
New Mexico Statutes Annotated Section 57-12-2 .........................................................18
*New Mexico Statutes Annotated Section 59A-30-1* ...........................................................12
New Mexico Statutes Annotated Section 59A-30-11 .......................................................12
New Mexico Statutes Annotated Section 59A-30-4.......................................................1, 5
New Mexico Statutes Annotated Section 59A-30-6.......................................................1, 4
Oregon Revised Statues Section 737.205.............................................................................5
Oregon Revised Statues Section 737.330..............................................................................5
Revised Code of Washington Section 48.29.140....................................................................5

**Treatises**
5 Wright & Miller, Federal Practice and Procedure: Civil § 1355 .........................................6
Wright & Miller, Federal Practice & Procedure § 1297 ..................................................18

Plaintiff, Quinn Woodard, through his undersigned counsel, hereby submits this memorandum of law in opposition to Fidelity National Title Company's Motion to Dismiss for (1) Lack of Standing to Assert Claims Arising in States Other than New Mexico, and (2) Failure to State a Claim (Docket #8.).

## I.    **INTRODUCTION**

This case addresses the pervasive practice by Fidelity National Title Insurance Company ("Fidelity") to routinely and systemically overcharge its customers for title insurance. New Mexico law (and the laws of all states in the proposed class) uniformly compels title insurers to offer drastically reduced premiums to customers who refinance their existing mortgage. Despite this unambiguous statutory obligation to extend a discount, Fidelity has routinely refused to do so, and has instead overcharged its customers in direct violation of law. This pattern and practice is in contravention of common law and the provisions of New Mexico Statutes Annotated §§ 59A-30-4 and 30-6.

Moreover, Fidelity's wrongful conduct is not limited to the jurisdiction of New Mexico. Indeed, its illegal premium overcharges have been perpetrated on consumers throughout the West: in Idaho, Washington, Oregon, New Mexico and Arizona, as alleged in the Amended Class Action Complaint. Thus, this class action seeks relief for the damages suffered by – and future protection of – consumers in all five identified class states, all of whom have been victimized by the same wrongful conduct.

Fidelity does not deny that it routinely fails to offer policies at the mandatory discounted rate. Nor does it dispute that this practice violates the provisions of New Mexico statutes. Nonetheless, Fidelity moves the Court to dismiss all claims against it, baldly asserting that any customers who **were illicitly overcharged** simply have no cognizable legal recourse. Quite literally, Fidelity asserts that it can overcharge consumers – in direct contravention of New Mexico statutes (as well as those of Idaho, Washington, Oregon and Arizona) – with total impunity.

The illogic and utter injustice of this position could not be more obvious, and courts across the nation have categorically rejected it.   Throughout the country, numerous homeowners have challenged the exact illegal practices at the center of this case, and in every one of those actions, the plaintiffs have successfully pled rights of recovery for their premium overcharge losses.  Indeed, courts have allowed and certified class actions that are substantively identical to this case.  Likewise, both federal and state courts have **uniformly** rejected title underwriters' motions to dismiss.[1] There is no reason that this case is any different.

## II.    <u>BACKGROUND</u>[2]

### A.    THE BUSINESS OF TITLE INSURANCE.

The adage, "Insurance is not bought, but sold," rings especially true in the arcane world of title insurance.  Title insurance is little understood by all but the most sophisticated consumer.  It is an unusual insurance product, because it protects not against future claims but against claims that might have occurred in the past.  Indeed, in the context of many modern home loans, even the **process of purchasing** a title insurance policy is utterly counterintuitive.  During a typical mortgage refinance, the bank which issues the new home will require a homeowner to pay for a title policy which protects not the homeowner himself, but the bank.  Consequently, the consumer will often be forced to pay the

---

[1] *E.g.*, *Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551 (D. Md. 2006); *Dubin v. Sec. Union Title Ins. Co.*, 832 N.E.2d 815 (Ohio Ct. App. 2005); In re Coordinated Title Ins. Cases, 2004 WL 690380 (N.Y. Sup. Ct. Jan. 8, 2004), *appeal not accepted for review*, 839 N.E.2d 403 (2003); *In re Coordinated Title Ins. Cases*, 2004 WL 690380 (N.Y. Sup. Ct. Nassau Co. Jan. 8, 2004) (certifying consolidated overcharge class against First American and other title insurance companies.); *Mitchell v. Chicago Title Ins. Co.*, 2003 WL 23786983 (Minn. Dist. Ct. Dec. 22, 2003) (certifying class alleging title insurance overcharges); *see also, Randleman v. Fidelity Nat. Title Ins. Co.*, 465 F. Supp.2d 812 (N.D. Ohio 2006); *Mitchell v. Chicago Title Ins. Co.*, 2004 WL 2137815 (Minn. Dist. Ct. August 13, 2004); *Barnes v. First Am. Title Ins. Co.*, 2006 WL 2265553 (N.D. Ohio Aug. 8, 2006*); Chesner v. Stewart Title Guar. Co.*, 2006 WL 2252542 at \*4-\*5 (N.D. Ohio Aug. 4, 2006); *Cohen v. Chicago Title Ins. Co.*, 2006 WL 1582320 (E.D. Pa. Jun. 5, 2006). *See also, Slapikas v. First American Title Insurance Co.*, No. 2:06-cv-00084-JFC (W.D. Pa.) (Docket entries dated May 8 and Dec. 22, 2006).

[2] Throughout the entire factual summary presented herein, unless otherwise indicated, all allegations are taken directly from provisions of Plaintiff's pending Amended Class Action Complaint ("Amended Complaint") (Docket #5.).

premium for a policy of insurance he never sees or receives.  As the Washington State Office of the

Insurance Commissioner has recently observed:

> [E]ven for the savviest of insurance consumers, the purchase of a title insurance policy
> is just one more expensive step in the dizzying, convoluted and often confusing flurry
> of paperwork and signings that culminate in the closing of a home purchase.
> Consumers who normally shop around for their insurance and carefully compare
> prices, typically emerge from the closing on their new home [having bought] an
> insurance policy that they know virtually nothing about.

Washington State Office of the Insurance Commissioner, *An Investigation Into the Use of*

*Incentives     and     Inducements     by     Title     Insurance     Companies*,     (Oct.     2006),     at     1

(http://www.insurance.wa.gov  /publications/news/Investigation_Title_Insurance.pdf).[3]    *See,   also,*

*Henderson v. Lawyers Title Ins. Corp.*, 108 Ohio St.3d 265, 272, 843 N.E.2d 152 (2006) (internal

quotation marks and citation omitted).

Complicating matters even further, in New *Mexico* (as in all other class states) just a handful of

title underwriting companies control the relevant insurance market.  Washington State Office of the

Insurance Commissioner, *An Investigation Into the Use of Incentives and Inducements by Title*

*Insurance Companies*, (Oct. 2006), at *Id.*  As a result of this competitive insulation, as well as

consumers' utter unfamiliarity with title insurance law and economics, various insurance regulators

have found that the entire title "**industry is rife with practices gone haywire.**" *Id.* at 2-3.  (Emphasis

added.)  In fact, pointed commentary by the Washington State Insurance Commissioner regarding

various conduct of title insurers concludes that illegal activity is "widespread and pervasive," and that

certain title companies have "made no apparent effort to comply with state law and regulations." *Id.*

Among the numerous abuses in the title insurance industry is a widespread practice of

overcharging for the premium paid on a policy of title insurance.  This practice is especially pervasive

in the home loan refinancing context.  In such refinance transactions, title insurers are legally required

---

[3] A courtesy copy of this report is attached to this Memorandum as Exhibit 1, and is offered under the provisions of
E.R. 201, as evidence solely of the published views and opinions of the Washington State Office of the Insurance
Commissioner.

to issue policies for a substantially lower fee, since the property in question has already been subject to previous title searches and is therefore: (1) easier and cheaper to underwrite; (2) subject to far less insuring risk.   However, title insurers routinely capitalize on the fact that almost no consumers are aware of their explicit legal right to receive a lower "refinance" premium, and will disregard the law by charging a higher "full-price" rate.   Overcharging also occurs where title insurers impose premium amounts that simply and blatantly exceed the rates approved by state departments of insurance – rates which thus have the force of law as maximum allowable prices.   Yet because homeowners – and even real estate professionals – usually have no idea that title policy rates are limited by law, insurers' price gouging is almost never discovered.   Both of these deceptive practices are the backdrop of Plaintiff's claims.

**B.**     **THE STATUTORY REGULATION OF TITLE INSURANCE PREMIUMS.**

New Mexico law (just like that of Idaho, Washington, Oregon and Arizona) compels all title insurers to strictly adhere to an official rate schedule when imposing policy premiums – including the application of refinance discounts.   The provisions of N.M.S.A. § 59A-30-6 (as well as the substantively identical statutory sections of all the class states) expressly prohibit insurers from charging or collecting any premiums which exceed these precise rates.[4]   Thus, if an insurer imposes prices higher than those listed on the official schedule, it is a per se violation of statute.[5]   Indeed, binding precedent within the class states recognizes that a title insurer's filed premium rates are the only prices which may be legally charged for a policy. *Inland Title Co. v. Comstock*, 116 Idaho 701, 703, 779 P.2d 15 (1989) ("Although this contract did not specify what the fee was, it was readily

---

[4]   *See, e.g.*, N.M.S.A. § 59A-30-6: "No premium that has not been promulgated by [law] shall be charged for any title insurance policy."

[5]   Title insurance rate schedules must actually enumerate the applicable premium price that may be charged for every possible type/level/amount of coverage.   Therefore, the exact dollar amount of every customer's premium is fixed.   (Amended Complaint, at ¶¶ 3-5.)

ascertainable by reference to statute and regulation [citation omitted], **which establish the premium rate as a matter of law**.") (Emphasis added).

## C.    PLAINTIFF'S COMPLAINT AND ALLEGATIONS.

As alleged in his Amended Complaint, Plaintiff Woodard was overcharged by Fidelity for a policy of title insurance which he purchased as part of a home loan refinance transaction. Specifically, Plaintiff Woodard was forced to pay a full price premium even though New Mexico law required the extension of a 40% refinance discount. (Amended Complaint, at ¶¶ 29-36.)

Plaintiff thereafter brought this action to recover the wrongful excess charges illegally extracted from himself, and from thousands of other consumers in the five class states of Idaho, Washington, Oregon, Arizona and New Mexico. Plaintiff's Amended Complaint alleges eight causes of action: Declaratory and Injunctive Relief (Count 1); violations of Title Insurance Rate Filing Statutes, including N.M.S.A. § 59A-30-4[6] (Count 2); Breach of Contract (Count 3); Violations of Consumer Protection Acts (Count 4); Conversion (Count 5); Unjust Enrichment (Count 6); Money Had and Received (Count 7), and; Breach of Duty of Good Faith and Fair Dealing (Count 8).

## III.    ARGUMENT

## D.    STANDARD APPLICABLE TO A MOTION TO DISMISS.

Defendant seeks dismissal of Plaintiff's complaint under F.R.C.P. 12(b). "The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Conley v. Gibson*, 355 U.S. 41, 48 (1957). Accordingly, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 45-46. *See also, Stidham v. Peace Officer Standards and Training*, 265 F.3d 1144, 1149 (10th Cir. 2001); *De La Cruz v. Tormey*, 582

---

[6] The Amended Complaint also alleges violations of Idaho, Washington, Oregon and Arizona statutes, as to residents of those states: I.C. §§ 41-2705 – 2707, R.C.W. § 48.29.140; 30-6 O.R.S. §§ 737.205 – 737.330, and; A.R.S. §§ 20-376 – 20-379).

F.2d 45, 48 (9th Cir. 1978) (citing *Conley, supra*). The issue is not whether a plaintiff's success on the merits is likely but rather whether the claimant is entitled to proceed beyond the threshold in attempting to establish his claims. *Id.* Moreover, in passing on a motion to dismiss, the allegations of the complaint should be construed favorably to the pleader. *Id.*; *see also* 5 Wright & Miller, Federal Practice and Procedure: Civil § 1355. As set forth below, dismissal of Plaintiff's complaint under this liberal rule is inappropriate.

E.    **PLAINTIFF HAS STANDING TO SUE INDIVIDUALLY AND ON BEHALF OF ABSENT CLASS MEMBERS IN NEW MEXICO AND IN OTHER STATES.**

    1.    **Defendant Confuses the Concepts of Article III Standing and Typicality.**

Confusing Article III standing with the typicality requirement of Rule 23 is a common mistake of litigants. As one commentator has noted:

> The conceptual similarity between the law of standing and underlying principles of class action representation has led to confusion because the courts have not always distinguished the two concepts. The confusion centers around the assertion, accepted at face value by many courts, that the plaintiff "must be a member of the class he or she seeks to represent."
>
>                        \* \* \*
>
> A person who has not been injured may not bring suit individually or on behalf of a class, because he or she lacks standing. When there has been a class wrong, any person who was injured has standing to sue. When the action is brought on behalf of a class, the standing requirement is not changed, but a civil procedural dimension is added—the plaintiff must have capacity to raise issues common to others similarly situated. This dimension is accounted for by Rule 23(a)(2), which requires that the class share common issues, and by Rule 23(a)(3), which requires that the named plaintiff's claims or the defendant's defenses be typical of the claims of or defenses against the class. If a plaintiff has standing to sue and his or her claim is typical, that claim raises common issues, and the plaintiff has capacity to raise issues common to the class. If the requirements of Rule 23 are met, the plaintiff may sue on behalf of the class of persons injured.

1 ALBERT CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS § 3:19 (4th ed. 2002) (footnotes omitted).[7]  To the extent that Defendant's motion confuses the concepts of standing with typicality it is, at best, premature because the issue of class certification is not before the Court. Assuming, on the other hand, that Defendant means Article III standing when it argues that Plaintiff lacks "standing," Plaintiff easily satisfies this low-hurdle requirement as set fort below.

### 2.    Plaintiff Alleges Injury to Himself and Absent Class Members.

Defendant argues that Plaintiff lacks "standing" to sue on behalf of persons in states other than New Mexico.  Defendant bases its conclusion on the unremarkable rule that "a named plaintiff must show he/she personally has been injured and may not base standing on the allegation that the injury was suffered by another unidentified member of the purported class."  (Def's Mem. in Supp. of Mtn. to Dismiss (Docket #9), at p.5, citing *Lewis v. Casey*, 518 U.S. 343, 357 (1996).)  However, Plaintiff's complaint *does* allege that he was personally injured by the acts and omissions of Defendant.  *See, e.g.,* Amended Complaint at ¶ 16: ("[D]efendant has caused plaintiff *and* the Class direct and compensable loss by charging them title insurance premiums which are patently in excess of the statutorily mandated fee rates governing such policies.") (emphasis added).  Plaintiff alleges that he, like other members of the class, was overcharged by Defendant for title insurance.

Defendant's reliance on *Casey, supra,* is thus completely misplaced.  The facts and holding of *Casey* and its progeny demonstrate only that courts frown on a class plaintiff attempting to bring causes of action against defendants **which have not caused him any damage** (but which may have caused others damage in a similar way, or through similar conduct).  The *Casey* decision itself even affirms that when a plaintiff pleads an injury to himself from a particular defendant, he has generally stated a claim against that defendant which gives him individual – and class action – standing: "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may

---

[7] For example, this is the cause of confusion present in one of the rulings cited by Defendant: *In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp.2d 1365, 1371 (S.D. Fla. 2001).

suffice." *Lewis v. Casey*, 518 U.S. at 358; *see also, Accord Easter v. American West Financial*, 381 F.3d 948, 961 (9th Cir. 2004) ("To satisfy the traceability requirement, a class action plaintiff must 'allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants.'") (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975). This is exactly what Plaintiff Woodard has done. Simply put, his complaint pleads injury in fact at the hands of the only Defendant in this case, Fidelity. Nothing more is required at the pleading stage, and the complaint may not be dismissed for lack of standing.

In attempting to turn this basic law on its head, Defendant conflates and confuses the issue of standing with questions involving an "adequacy/typicality" analysis under F.R.C.P. Section 23. For when a class plaintiff obviously alleges a direct injury from the named defendant – thereby establishing standing -- it is only in such a class certification context that his representative capacity of other individuals may be rightly discussed. As stated in such authority as *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 269 (D. Mass. 2004), where a plaintiff "assert[s] personal claims under the laws of the state[] in which [he] reside[s]" any questions of interstate class representation must be analyzed solely at the class certification stage of proceedings.[8]

### 3.     Plaintiff Does Not Allege that the Injury to Himself Violated the Laws of Other States.

Defendant further contends that Plaintiff may not claim injury under the laws of states other than New Mexico, his state of domicile, because "[n]one of the Other States' laws authorizes claims based on actions or commerce in another state." (Def's Mem. in Supp. of Mtn. to Dismiss (Docket #9), at p.6, n.2.). Putting aside the fact that Defendant provides no support for this proposition – not so much as a citation to the relevant portions of the statutes of other states to which it refers – the entire argument

---

[8] Notably, copious federal precedent establishes that in class actions, issues of inter-state standing are only addressed **after** a class has been certified: e.g., *Payton v. County of Kane*, 308 F.3d 673, 680, 682 (7th Cir. 2002); *James v. City of Dallas*, 254 F.3d 551, 562 & n. 9 (5th Cir. 2001); *In re Buspirone Patent Litig.*, 185 F.Supp.2d 363, 377 (S.D.N.Y. 2002); *Clark v. McDonald's Corp.*, 213 F.R.D. 198, 204-05 (D.N.J. 2003); *In re Pharmaceutical Industry Average Wholesale Price Litig.*, 263 F.Supp.2d 172, 193-94 (D.Mass. 2003).

is misplaced. Indeed, in a seminal class certification ruling from this very District, the same argument was rejected. *See, Sollenbarger v. Mountain States Telephone & Telegraph Company*, 121 F.R.D. 417 (1988) (certifying and **applying the law of New Mexico to seven-state class** of residential telephone customers where there was no appreciable difference in state laws).

First, state law of standing does not govern such determinations in the federal courts. *Village of Arlington Heights v. Metropolitan Housing,* 429 U.S. 252, 97 S.Ct. 555, 262 (1977). As Defendant concedes, the constitutional and prudential considerations underlying Article III standing respond to concerns that are peculiarly federal in nature. *Id.* (citing *Warth*, 422 U.S. 490) (holding that inquiry as to standing involves both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise; in both dimensions, it is founded in concern about the proper, and properly limited, role of the courts in a democratic society); *see also,* Def's Mem. in Supp. of Mtn. to Dismiss (Docket #9), at p.4 ("A party attempting to invoke the jurisdiction of the federal courts is required to set forth a case or controversy as imposed by Article III of the Constitution.").

Secondly, Plaintiff does *not* allege that the injury to him individually violated the laws of other states; rather, he alleges that he was injured and that his injury is typical of those of other members of the class irrespective of where they reside. Notwithstanding Defendant's mischaracterization of his complaint, Plaintiff does not purport to apply the laws of other states to his individual claim or to apply the law of New Mexico to the claims of persons in other states. Defendant makes the unremarkable observation that "Woodard does not, and cannot, allege that he was injured under the statutes or common law of the Other States." (Def's Mem. in Supp. of Mtn. to Dismiss (Docket #9), at 6, n.2.) Moreover, as explained previously, this is an issue of whether or not Plaintiff's injury and claims of wrongdoing are typical of those of absent class members. This decision is not before the Court, and should be deferred until the class certification stage of the proceedings.

**F.    PLAINTIFF'S COMPLAINT STATES A CLAIM UPON WHICH RELIEF CAN BE GRANTED.**

Defendant seeks dismissal of Plaintiff's complaint in its entirety for failure to state a claim.  As noted previously, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 48.  Because Plaintiff's complaint amply satisfies this standard, Defendant's motion should be denied.

      **1.    Plaintiff States a Claim for Injunctive and Declaratory Relief.**

Defendant seeks dismissal of Plaintiff's claim for injunctive and declaratory relief (Count I), arguing that the allegations of Plaintiff's complaint "fail to demonstrate elements required for such relief." Def's Mem. in Supp. of Mtn. to Dismiss (Docket #9), at 7.  This argument fails because it ignores the plainly pled allegation that Fidelity will continue to unleash future widespread overcharging of many other consumers in Plaintiff's exact situation.  Indeed, it disregards the very nature and purpose of a class action suit brought under F.R.C.P. 23.  For these reasons, declaratory and injunctive relief are appropriate.

Most obviously, Fidelity's attempt to dismiss claims for declaratory / injunctive relief runs directly afoul of F.R.C.P. 23(b)(2), which specifically authorizes such redress to a class action claimant. F.R.C.P. 23(b)(2).  As the official Rule comments state: declaratory and/or injunctive relief are appropriately requested when a Court is asked to "settl[e] the legality of [a defendant's] behavior with respect to the class as a whole."  Specifically contemplated as proper objects of declaratory/injunctive relief are situations in which a defendant's "[a]ction or inaction . . . has taken effect or is threatened only as to one or a few members of the class."[9]  Consequently, Fidelity's assumption that Plaintiff may not seek such relief because she has already been overcharged is untenable.  Clearly manifest in the

---

[9] *See* Official Comments to F.R.C.P. 23(b)(2).

purpose of Rule 23(b)(2) is the intent to allow a plaintiff on whom a defendant's conduct "has [already] taken effect" to sue for prevention of future harm to others similarly situated.

The truth of this proposition forms part of bedrock federal precedent. Indeed, regardless of class action status, federal courts have long understood that a claimant can seek declaratory or injunctive relief – even where defendant alleges it would be moot as to past wrongs – if there is a realistic possibility that the same conduct could be perpetrated against the claimant in the future. In such instances, courts will grant such injunctive relief so as to prevent illicit behavior which is deemed "capable of repetition, yet evading review." *Honig v. Doe*, 484 U.S. 305, 318, 108 S. Ct. 592 (1988) (citing *Murphy v. Hunt*, 455 U.S. 478, 482, 102 S. Ct. 1181 (1982); *Porter v. Jones*, 1319 F.3d 483, 489-90 (9th 2003). This is precisely the scenario which Plaintiff has pled, and which entitles him to declaratory and injunctive relief.

Independently, Fidelity's factual propositions about the impossibility of any future harm to Plaintiff are hopelessly flawed. Therein, the defendant improperly assumes – in a self-serving manner impermissible on a motion to dismiss – that just because Plaintiff is now aware he has been damaged by Fidelity and its agents once, he will be impervious to any financial harm in the future. This is absurd and is precisely the situation that the Rule 23(b)(2) request for declaratory and injunctive relief is calculated to prevent. For such a proposition to be even potentially true, Fidelity must unwarrantedly speculate that in all future refinances, Woodard will: (1) know where and how to read applicable official title insurance rate filings; (2) affirmatively undertake the significant time and energy necessary to do so (i.e. traveling to the offices of the insurance regulators which such filings are kept); (3) engage in all of this potentially needless verification **even after being told – falsely – by official refinance documents that he is being charged a legally appropriate premium**. Fidelity cannot make such purely defense oriented hypotheses on a motion to dismiss. It cannot assume that Woodard and all

other consumers must painstakingly check official filed rates to verify every price statement they receive from a title insurer.

The cases cited by Fidelity are inapposite. Every one of these authorities concerns an instance in which a named plaintiff had not been able to plead any actual past or present damages to himself as a basis for standing to sue. Each case revolves solely around an analysis of the ripeness of the plaintiff's claim. There is no question here that Plaintiff's claim is ripe for adjudication. Plaintiff pleads present harm; thus, under Rule 23(b)(2), Plaintiff seeks both damages and a request for declaratory and injunctive relief which will prevent perpetuation of further identical damages to himself and on other similarly situated consumers.

### 2. An Implied Right of Action Exists Under the New Mexico Title Insurance Law, N.M.S.A. § 59A-30-1, et seq.

Defendant contends that there is no private right of action for violations of New Mexico's title insurance rate filing statutes: N.M.S.A. § 59A-30-1, *et seq.* In making this conclusion, however, Fidelity wholly ignores binding case law which specifically recognizes such a right. In *Ruiz v. Garcia*, 115 N.M. 269, 850 P.2d 972 (1993), the Supreme Court of New Mexico interpreted the provisions of N.M.S.A. § 59A-30-1, et seq. and categorically held that a private party has an implied right of action to bring claims against a title insurer for breaches of the statutory duties created by these laws. *Ruiz*, 115 N.M. at 273-274. In *Ruiz*, the court addressed the question of whether a plaintiff could pursue claims for violation of the Title Insurance laws (N.M.S.A. § 59A-30-11) even when she did not possess any contractual relationship with the title insurer defendant. *Id.* The court wholeheartedly concluded that she could, via a private right of action. *Id.* ("We hold that New Mexico Title owed a duty of reasonable care to Garcia under Section 59A-30-11(A) and that its failure to discover a defect of title [as proscribed by statute] is actionable for her."), citing *Cottonwood Enterprises v. McAlpin*, 111 N.M. 793, 796, 810 P.2d 812 (1991) (emphasis added). See, also, *Lisanti v. Alamo Title Ins. of Texas*, 131 N.M. 334, 337, 35 P.3d 989 (N.M. App. 2001) (recognizing without comment that violations of title

insurance law can also be brought by title insureds as "unfair insurance practices" claims) (aff'd in part, rev'd in part on other grounds at 132 N.M. 750, 55 P.3d 962 (2002)).

The *Ruiz* decision was founded squarely on the obvious notion that New Mexico's title insurance statutes (inclusive of rate filing requirements) were intended to "provide for the protection of consumers and purchasers of title insurance policies." *Ruiz*, 115 N.M. at 273. As a result of this "policy," the court then concluded that a private right of action effectuated the law's intent and helped to give adequate legal recourse to the class of individuals protected by title insurance laws: consumers and purchasers.

### 3.     Fidelity Breached Its Implied Contract With Plaintiff to Charge the Legally Mandatory Premium Rate.

Defendant seeks dismissal of Plaintiff's claim for breach of contract implied in fact, arguing that New Mexico law prohibits implied contracts "that cover[] the same subject matter as an express contract." Def's Mem. in Supp. of Mtn. to Dismiss (Docket #9), at 10. A review of Defendant's authorities for this proposition reveals that this is not the law in New Mexico. Rather, the cases cited by Defendant stand for the unobjectionable conclusion that the *terms* of a contract may not be implied where the agreement contains express *terms* covering the same subject matter. *See Continental Potash, Inc. v. Freeport-McMoran, Inc.*, 115 N.M. 690, 704, 858 P.2d 66, 80 (N.M. 1993) ("[W]hen the contract between the parties speaks to the obligation sought to be implied, courts will not write that implied obligation into the contract."); *Stern v. Dunlap Co.*, 228 F.2d 939, 942 ("[W]here a written agreement between contracting parties is seemingly complete, a court will not lightly imply an additional covenant enlarging its terms.") (citations omitted).

This principle is wholly irrelevant to Plaintiff Woodard's claim for breach of implied contract. Whether or not there is an express contract, with express terms, between Fidelity and a third party (Plaintiff's mortgage lender) is simply not germane to whether Fidelity had an implied contractual duty

to *Plaintiff* to issue a title insurance policy at legal title insurance premium rates, as Plaintiff alleges in his complaint. (Amended Complaint, at ¶¶ 47-49.)

### a.    Plaintiff has pled all the elements necessary to establish an implied in fact contract, and its breach by Fidelity.

Formation of a valid contract requires that there be a meeting of the minds as evidenced by a manifestation of mutual intent to contract. This manifestation takes the form of an offer and acceptance in the context of express contract. *Hartbarger v. Frank Paxton Co.*, 115 N.M. 665, 669, 857 P.2d 776 (1993). In contrast, contracts implied in fact do not require such a formal exchange of promises. In a contract implied in fact, the meeting of the minds may be proved by showing that the parties' conduct make it reasonably certain that an agreement was intended. *Garcia v. Middle Rio Grande Conservancy Dist.*, 121 N.M. 728, 732, n.1, 918 P.2d 7 (1996).

Here, Plaintiff has alleged the following clear facts which establish all elements of an implied in fact contract and its breach: (1) plaintiff agreed to purchase a title insurance policy which named his mortgage lender as beneficiary (as is required in all refinances); (2) in exchange, Defendant Fidelity agreed to issue the title insurance policies at the only legally appropriate rates which could be charged or paid, i.e., the officially filed discounted reissue rates; (3) as consideration for the parties' bargain – and as manifestation of their common intent – plaintiff in fact paid the premium, Fidelity accepted it, and issued the contemplated policy; (4) Fidelity then breached the parties' agreement when it failed to charge Plaintiff (and other putative class members) the obligatory discounted reissue price. *See, e.g., Randleman*, 465 F.Supp.2d at 818-19; *Barnes*, at 2006 WL 2265553, *4-5 (N.D.Ohio 2006).

This precise result has been reached by authorities in the class states when addressing the specific scenario of title insurance policy purchases. Observing that premium rates for title insurance are set as a matter of law by reference to statute and regulation, the Idaho Supreme Court has recognized that when individuals buy title insurance there is an implied agreement by which they effectively contract to pay the established premium set forth in the rate manual. *Inland Title Co. v.*

*Comstock*, 116 Idaho 701, 703, 779 P.2d 15 (1989) ("When individuals buy title insurance they in effect agree to pay the established premium."). Because the premium prices set forth in the rate manual are legally binding, the rate manual becomes an implied term of every contract for the purchase of title insurance. *Id.*

> b.   **Other courts have found an implied in fact contract to exist in nearly identical circumstances.**

In cases dealing with title rate statutes similar to those of the class states, other federal courts have adduced an implied in fact contract. For example, in *Randelman,* the United States District Court for the Northern District of Ohio found the existence of an implied-in-fact contract on facts virtually identical to those pled here. 465 F. Supp.2d at 818-19. Like Plaintiff in this case, the *Randleman* plaintiffs sought to recover from the defendant title insurer the amount of the premium they paid for title insurance in excess of the premium allowed under Ohio law. The *Randleman* complaint asserted several causes of action, including a claim for breach of contract. *Id.* at 812.

Although the plaintiffs did not ever specifically refer to an implied in fact contract in their complaint, the court nonetheless found that their pleadings contained direct or inferential allegations with respect to all essential elements of a claim of breach of an implied in fact contract. Therein, the plaintiffs alleged that: 1) they paid a premium for the purchase of title insurance from the defendant title insurer; 2) plaintiffs' lender was the beneficiary of this title insurance policy; 3) the defendant title insurer had the obligation to charge a premium complying with the rate schedule it filed with the Ohio Department of Insurance; 4) the defendant title insurer charged more than the rate schedule premium; and 5) the defendant title insurer failed to inform plaintiffs that they qualified for the discounted rate. Based upon these allegations, the court concluded:

> that the plaintiffs entered into an implied-in-fact contract with [the title insurer] under which [title insurer], in consideration of the plaintiffs' anticipated payment at closing of the premium for the title insurance being charged by [title insurer], agreed to issue a title insurance policy to the plaintiffs' lender. **By issuing the policy to the lender, [the title insurer] implicitly assented to the terms of the implied-in-fact contract,**

**which, in turn, implicitly provided that the cost of the insurance would be lawful [i.e., in conformity with the rate schedule].**

*Id.* at 819. (Emphasis added). *See also, Accord Barnes*, 2006 WL 2265553 at *5 ("Upon review of Plaintiffs' Complaint, the Court finds Plaintiffs have plead sufficient facts to support a breach of contract claim on a Motion to Dismiss. The Complaint clearly alleges the Plaintiffs purchased title insurance from Defendant and that under applicable Ohio law Plaintiffs were entitled to the discounted rate....Pursuant to *Lucas*, this transaction is the 'most obvious example of the use of the implied contracts concept.'"); *Chesner*, 2006 WL 2252542, at *5 (same).

In light of this obvious precedent, Fidelity's reliance upon *Scott v. First American Title Ins. Co.*, 2007 WL 135909 (D.N.H. Jan. 17, 2007), is inexplicable and misplaced. In *Scott*, the New Hampshire district court found that the plaintiffs had failed to explain how rate manual provisions which title insurers were **not required by law to follow** – and which thus differ from the rate schedules in all the class states – became part of an implied purchase contract. *Id.* at *4-5. Here, however, Fidelity simply cannot argue that Plaintiff Woodard has failed to explain how the provisions of a mandatory rate schedule – which has the force of law – were incorporated into their contracts.  Unlike in New Hampshire, the rate filing statutes of New Mexico, Idaho and all other class states are **mandatory** and must therefore become part of any title insurance purchase agreement.  Indeed, decisions such as *Inland Title* have already clearly articulated this exact principle: that the mandatory provisions of official rate schedules are implied in every contract for the purchase of title insurance. *Inland Title*, 116 Idaho at 703.

4. **Plaintiff States a Claim for Violation of the New Mexico Unfair Practices Act, N.M.S.A. § 57-12-1, *et seq.***

   a. **Plaintiff Woodard establishes all elements of his claim.**

Plaintiff Woodard has adequately pled violations of New Mexico's Unfair Practices Act ("UPA"), N.M.S.A. § 57-12-1, *et seq.* [10] Inarguable precedent establishes the four elements necessary to state a claim under the UPA:

> Four elements must be established to invoke the Unfair Practices Act. First, the complaining party must show that the party charged made an 'oral or written statement, visual description or other representation…' that was either false or misleading. Second, the false or misleading representation must have been… 'made in connection with the sale, lease, rental or loan of goods or services in the extension of credit or… collection of debts….' Third, the conduct complained of must have occurred in the regular course of the represeter's trade or commerce. And, fourth, the representation must have been of the type that 'may, tends to or does, deceive or mislead any person.'

*Ashlock v. Sunwest Bank*, 107 N.M. 100, 753 P.2d 346 (1988) (citing NMSA 1978, §§ 57-12-2(C)).

Fidelity cannot challenge the obvious conclusion that its charging and collecting of title insurance premiums occurred in the course of its regular business, and concerned a sale of goods or services (elements two and three). Moreover, elements one and four – a misleading statement that "may, tends to, or does, deceive… any person" are clearly established through Plaintiff Woodard's allegations. Therein, he has asserted that the Defendant charged an inflated premium for a policy of title insurance in contravention of applicable rate filing statutes. In charging and collecting these illicit premium amounts in excess of those authorized by official rate filings, Fidelity uniformly misrepresented in form documents the legally allowable price of its policy premiums. Fidelity similarly failed to disclose to any class members the legal applicability of refinance discounts, while impliedly representing that the title insurance premium charge was in fact the appropriate premium under law. These flagrantly misleading acts have an undeniable capacity or tendency to mislead consumers, and are therefore actionable as "unfair or deceptive" under NMSA § 57-12-3. Importantly, the New Mexico Supreme Court has held that a defendant's distortions of truth will violate the UPA regardless of whether they were made intentionally or unintentionally. *Ashlock v. Sunwest Bank of*

---

[10] These allegations also satisfy the substantively similar requirements of all class states' "Consumer Protection Act" statutes except that of I R.C.P. § 19.86.010, et seq.; O.R.S. § 646.605, et seq.; N.M.S.A. § 57-12-1, et seq.; A.R.S. § 44-1521, et seq.

*Roswell*, 107 N.M. 100, 753 P.2d 346 (1988), overruled on other grounds by *Gonzales v. Surgidev Corp.*, 120 N.M. 133, 140, 899 P.2d 576, 583 (1995).

Additionally, it should be noted that Fidelity's deception regarding legally allowable premium rates runs afoul of several **specifically enumerated unfair practices** (provided as illustrative examples) in other sections of the UPA: § 57-12-2(D). [11]  That section sets forth seventeen types of conduct that *a priori* constitute either an unfair method of competition or an unfair or deceptive act or practice. N.M.S.A. 1978, § 57-12-2(D).  It is informative to note that Fidelity's deceptive conduct violates a triad of these strictures:

> (D)(11): "making false or **misleading statements of fact concerning the price of goods** or services…;"
>
> (D)(14): "***using*** exaggeration, innuendo or **ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive**," and;
>
> (D)(17): "**failure to deliver the** quality or **quantity of goods or services contracted for**."

(Emphasis added.)

      **b.**      **The heightened pleading standards of F.R.C.P. 9(b) do not apply to Plaintiff Woodard's claim under the UPA.**

Defendant seeks dismissal of Plaintiff's UPA claim by arguing that his allegations do not satisfy F.R.C.P. 9(b).  Defendant wrongly assumes that because "Woodard pleads the elements of common law fraud," Rule 9(b) applies. [12]  (Def's Mem. in Supp. of Mtn. to Dismiss (Docket #9), at p.11 (citing Amended Complaint, at ¶¶ 56-57).)   However, Rule 9(b) applies only to averments of common law or statutory fraud. Fed. R.Civ.P. 9(b); *see also,* Charles C. Wright & Arthur R. Miller, Federal Practice & Procedure § 1297, at 615 (1990 & Supp. 2000). Because the rule is an exception to

---

[11] The unfair and deceptive practices prohibited by § 57-12-2(D) include "but [are] not limited to" the seventeen (17) enumerated practices under Subsection (D).

[12] Defendant maintains that violations of the UPA must satisfy the pleading standards of Rule 9(b), but only analogizes to authorities all from states other than New Mexico (*e.g.,* Florida, Texas, Utah and Colorado).  Plaintiff is unaware (as Defendant presumably is) of any case holding that Rule 9(b) applies to the UPA.

the Federal Rules' liberal notice pleading requirements, Rule 9(b) "should be construed narrowly and not extended to other legal theories or defenses." *Id.* Heeding this caution, many courts have recognized that a plaintiff need not satisfy Rule 9(b)'s heightened pleading requirements to satisfactorily allege claims of relief under consumer protection statutes. *See, e.g., Ostrzenski v. Siegel,* 177 F.3d 245, 251 (4th Cir. 1999) (applying Florida law and concluding heightened pleading requirements did not apply); *Recreation Services, Inc. v. Odyssey Fun World, Inc.,* 952 F.Supp. 594 (N.D.Ill. 1997) (finding that the plaintiff was not required to plead particular factual allegations in complaint to support claim under the Illinois Consumer Fraud and Deceptive Business Practices Act).

Importantly, New Mexico's UPA does not require a plaintiff to prove actual deception, fraudulent intent, or reliance, and therefore does not refer to the common law tort of fraud. *See, e.g., Russey v. Rankin,* 911 F.Supp. 1449, 1460 (D.N.M. 1995) ("The alleged misrepresentation need not be intentionally made but it must be knowingly made. The 'knowingly made' requirement is met if a party was actually aware that the statement was false or misleading when made, or in the exercise of reasonable diligence should have been aware that the statement was false or misleading." (citing *Stevenson v. Louis Dreyfus Corp.,* 112 N.M. 97, 100, 811 P.2d 1308, 1311 (1991); *see also, Qarbon.com Inc. v. eHelp Corp.,* 315 F. Supp. 2d 1046 (N.D. Cal. 2004) (determining that allegations that a party knowingly made false representations was not grounded in fraud). Given that claims brought under the UPA do not necessarily require allegations of fraud, Rule 9(b)'s pleading standard does not apply.

   c.    **Under any pleading standard, Plaintiff Woodard has alleged his UPA claim with sufficient particularity.**

Defendant argues that Plaintiff Woodard's UPA claim is not sufficiently particular to satisfy F.R.C.P. 9(b). Yet even if such a pleading standard were to apply, Plaintiff's Amended Complaint easily fulfills it. The Tenth Circuit regards the requirements of Rule 9(b) as a directive to "afford [a] defendant fair notice of plaintiff's claims and the factual ground upon which they are based." *Koch v.*

*Koch Industries, Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (citations omitted). This may be accomplished by setting forth information concerning the time, place, source and content of a false representation. *Id.*

Plaintiff Woodard's Amended Complaint could hardly articulate with more specificity the required elements of Defendant's actionable misconduct under the UPA. The Amended Complaint enumerates in detail the time, source, place, and content of Fidelity's deceptive and wrongful overcharging:

| | |
|---|---|
| Time: | the days leading up to and including Plaintiff Woodard's refinance transaction, which closed in May of 2005; (Amended Complaint, at ¶ 30.) |
| Place: | Plaintiff Woodard received Defendant's misstatements, and illegal overcharging, in Albuquerque, NM, at the location of his refinance transaction; (Id.) |
| Source: | Defendant Fidelity, which deceptively charged an excessive premium; (Id., at ¶¶ 34-36.) |
| Nature: | Defendant Fidelity misleadingly and unfairly charged Plaintiff (and class members) an excessive title insurance premium in violation of law. (Id.) |

In point of fact, Plaintiff's Amended Complaint even clearly sets forth Fidelity's knowledge of its deceptive conduct (information unnecessary to a claim under the UPA), and the injury resulting from Defendant's unscrupulous scheme to deceive and overcharge title insurance customers. (Amended Complaint, at ¶¶ 33-36.)

### 5.  Plaintiff States a Cause of Action for Conversion.

Plaintiffs adequately plead conversion against Fidelity. Conversion is any distinct act of dominion wrongfully exerted over another's personal property in denial or inconsistent with his rights therein. *Security Pacific Financial Services, a Div. of Bank of America, FSB v. Signfilled Corp.*, 125 N.M. 38, 43, 956 P.2d 837 (N.M. App. 1998). Plaintiff's conversion claims are based upon Fidelity's conduct in inducing them to pay, and appropriating, an excessive insurance premium.

While it is true that ordinarily a conversion claim relates to personal property (*See, e.g. McNeill v. Rice Engineering & Operating, Inc.*, 139 N.M. 48, 58, 128 P.3d 476 (N.M. App. 2005)), the cause

will also lie when money, which is specifically described or identified, is the subject of allegedly wrongful misappropriation. *McNeill*, 139 N.M. at Id. (implicitly recognizing that under correct facts, dominion over money can form the basis of a conversion claim). This conclusion bears out fundamental notions of the tort of conversion: "The modern action for the tort of conversion always has been colored by its descent from the common law action of trover, which originated as a remedy against the finder of lost goods who refused to return them....With the disappearance of the forms of action, the modern action of conversion has undergone a slow process of extension, which has carried it beyond these ancient limits of the action of trover." Restatement (Second) Torts § 242 (Comment d). Here, the title insurance premium overcharges paid by Plaintiff are tangible monies identified with specific title insurance policies issued by Fidelity, and are hence subject to a conversion action. *See,* Id.

### 6.    Plaintiff States a Claim for Unjust Enrichment.

Unjust enrichment is a retroactive equitable remedy, where one party has been unjustly enriched at the expense of another. *Ontiveros Insulation Co., Inc. v. Sanchez*, 129 N.M. 200, 203, 3 P.3d 695 (N.M.App. 2000). The doctrine of unjust enrichment sounds in implied in law contract or quasi contract. *See, Hydro Conduit Corp. v. Kemble*, 110 N.M. 173, 175, 793 P.2d 855 (1990) ("This quasi-contractual obligation is created by the courts for reasons of justice and equity notwithstanding the lack of any contractual relationship between the parties.") (citation and internal quotation marks omitted); *Ontiveros,* 129 N.M. at 204 ("The theory has evolved largely to provide relief where, in the absence of privity, a party cannot claim relief in contract and instead must seek refuge in equity.")

For a plaintiff to sustain an unjust enrichment action, he must prove the following key elements: (1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance of the benefit under circumstances that would be inequitable for the defendant to retain the benefit without payment to the plaintiff of the value thereof. *Ontiveros,* 129 N.M. at 204.

Here, the allegations of the Amended Complaint clearly establish that Plaintiff conferred a benefit on Fidelity in the form of an overcharge - a payment for title insurance exceeding the amount permitted by statute. Fidelity appreciated and retained the extra payment, and the circumstances - accepting a payment expressly forbidden by statute - make that acceptance wrongful. In fact, Fidelity hardly disputes the elements of a claim for unjust enrichment, or the Plaintiff's ability to ultimately prove his case. Instead, with arguments that make little sense, Fidelity seems to attack Plaintiff's claims on convoluted and implausible contract-based grounds.

Therein, Defendant contends that Plaintiff Woodard may not recover for unjust enrichment because "the matter at issue is governed by the terms of an express contract," and then proceeds to acknowledge that no written (or express) contract ever existed between Fidelity and Woodard. (*See*, Def's. Mem. in Supp. of Mtn. to Dismiss, at pp. 13-14.) Defendant is forced into this flaw of contradiction because, as illustrated in Argument Section C(3), *supra*, Plaintiff Woodard formed an **implied** – the opposite of "express" – **contract** with Fidelity. Thus, Defendant's attempt to evade unjust enrichment liability makes no sense.

Indeed, recognizing the incorrectness of Fidelity's arguments, other federal courts have sustained unjust enrichment claims on the precise facts alleged by Plaintiff, here. As stated in *Randleman*, 465 F. Supp.2d at 825, Plaintiff's allegations that he paid too much for title insurance premiums – in violation of applicable rate statutes – establish the requisite "transactional nexus" (i.e. privity) for a valid unjust enrichment cause of action. *See also, e.g., Cohen v. Chicago Title Ins. Co.*, 2006 WL 1582320, * 3 (E.D. Pa. 2006).

### 7.    Plaintiff States a Claim for Breach of the Duty of Good Faith and Fair Dealing.

Fidelity contends that a plaintiff cannot state a claim for a breach of the covenant of good faith and fair dealing unless the plaintiff was a party to a contract with the defendant. While correct in its characterization of the law, Fidelity's argument studiously ignores the well pled existence of the

implied contract between Plaintiff and itself for the purchase of title insurance. See, Argument Section C(2), *supra*.

New Mexico courts (like those of other class states) have long recognized that a duty of good faith and fair dealing is implicit in every contract. *Bourgeous v. Horizon Healthcare Corp.*, 117 N.M. 434, 438, 872 P.2d 852 (N.M. 1994) (quoting *Watson Truck & Supply Co. v. Males*, 111 N.M. 57, 60, 801 P.2d 639 (1990). The covenant of good faith and fair dealing requires that the parties perform in good faith the obligations imposed by their agreement, and a violation of the covenant occurs when either party violates, nullifies or significantly impairs any benefit of the contract. *Bourgeous* 117 N.M. at Id.

Here, Fidelity had a duty of good faith and fair dealing relative to its implied purchase contract with Plaintiff Woodard. Plaintiff has adequately pled this implied in fact agreement which: (1) bound him to pay the legal premium for a policy of title insurance; (2) bound defendant to issue the policy and collect only the legal premium therefor. This contract necessarily gave rise to the ubiquitous duties of good faith created by any contractual relationship. *Id.* By issuing a title policy but charging in excess of the rate allowed by law, Fidelity breached its duty of good faith and fair dealing – the obligation which required it to act in accordance with statute when imposing premium amounts. *See, Bourgeous* 117 N.M. at Id.; *see also, Chesner*, 2006 WL 2252542, *6 (holding that "the duty of good faith and fair dealing permeates the entire insurance transaction" including payment of the correct premium in observance of applicable rate statute.)

Fidelity cannot legitimately assert that New Mexico law somehow expressly limits the contractual duty of good faith to a small subset of insurer-insured interactions. This may be true for **insurance policies**, but the contract on which Plaintiff rely is decidedly NOT an insurance policy. It is an implied in fact agreement to pay the right rate for a policy, and see that policy issued to Plaintiff's mortgage lender (so that Plaintiff could get a refinance loan). (See, Amended Complaint, *passim*.)

Consequently, all of Fidelity's discussion and authority regarding when and where an "insurance policy" creates a cognizable duty of good faith is totally irrelevant.

### 8. Plaintiff States a Claim for Money Had and Received.

Finally, Defendant submits that Plaintiff's money had and received claim should be dismissed because it is the functional equivalent of his claim for unjust enrichment, which Defendant attacks on the flawed grounds addressed in Section C(6), *supra*. Assuming *arguendo* that New Mexico courts do not recognize a cause of action for money had and received which is independent of unjust enrichment, Defendant's motion should be denied for the reasons set forth in Section C(6).

However, precedent such as *Elgin v. Gross-Kelly & Co.*, 20 N.M. 450, 451, 150 P. 922 (N.M. 1915) would appear to indicate that a claim for money had and received can indeed arise in New Mexico, as it can in other states: "Where money has been paid under mistake as to a material fact to one not entitled thereto and who cannot in good conscience receive and retain it, the law raises an implied promise on his part to refund it, and an action will lie to recover it back." *Id.*

This is precisely the situation in this case. Fidelity assessed and collected a title insurance premium from Plaintiff in an amount that exceeded the rate permitted by law. (*See,* Amended Complaint, *passim.*) In so doing, Fidelity received money it had no right in equity or good conscience to retain. Under the plain elements of money had and received, Plaintiff has stated an actionable claim.

### IV.    CONCLUSION

For all the foregoing reasons, defendant Fidelity National Title Insurance Company's Motion to Dismiss for (1) Lack of Standing to Assert Claims Arising in States Other than New Mexico, and (2) Failure to State a Claim (Docket #8), should be denied.

DATED:  April 27, 2007

Respectfully submitted,

GREENER BANDUCCI SHOEMAKER, P. A.

/s/ Benjamin Schwartzman

By:_____

    Benjamin A. Schwartzman
     Wade L. Woodard, NMSB No. 9519
950 West Bannock Street, Suite 900
Boise, Idaho  83702
Tel.: (208) 319-2600
Fax: (208) 319-2601



Paul M. Weiss
William M. Sweetnam
FREED & WEISS LLC
111 West Washington Street, Suite 1331
Chicago, Illinois  60602
Tel.: (312) 220-0000
Fax: (312) 220-7777

*Attorneys for Plaintiff and the Class*